**UNITED STATES of America, Plaintiff,**

v.

**Jimmie C. JOHNSON, Defendant.**

**No. 4:97CR3002.**

United States District Court,
D. Nebraska.

July 31, 1997.

---

John C. Vanderslice, Federal Public Defender's Office, Lincoln, NE, for Jimmie C. Johnson.

Richard E. Rothrock, Asst. U.S. Atty., Lincoln, NE, for U.S.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This matter is before the court on the Magistrate Judge's Report and Recommendation (filing 48) and the objection to such Report and Recommendation (filing 51) filed as allowed by 28 U.S.C. § 636(b)(1)(C) and NELR 72.4.

I have conducted, pursuant to 28 U.S.C. § 636(b)(1) and NELR 72.4, a de novo review of the portions of the Report and Recommendation to which objection has been made.

Inasmuch as Judge Piester has fully, carefully and correctly found the facts and applied the law I need only state that Defendant's motion to dismiss the indictment for the reason the process for selecting petit and grand juries is flawed should be denied.

IT IS ORDERED:

1. the Magistrate Judge's Report and Recommendation (filing 48) is adopted;

2. Defendant's objections (filing 51) are overruled; and

3. Defendant's motion to dismiss the indictment (filing 34) is denied.

## REPORT AND RECOMMENDATION

PIESTER, United States Magistrate Judge.

Pending before the court is defendant's motion to dismiss his indictment for illegal drug trafficking, on the ground that the court's system for randomly selecting petit and grand jurors is flawed. (Filing 34.) In particular, defendant, an African–American male, argues that this district's method of compiling its jury pool by means of voter registration lists results in the systematic underrepresentation of African–Americans. Upon consideration of the documents and testimony adduced at the evidentiary hearing in this matter, I shall recommend that the motion to dismiss be denied.

## BACKGROUND

This court has long used voter registration lists as the means of forming its jury pool, and this practice is specifically contemplated by 28 U.S.C. § 1863, which governs plans for random jury selection.[1] Discrimination based on race, color, religion, sex, national origin, or economic status is prohibited. 28 U.S.C. § 1862. Voter registration is used because the lists automatically screen out many of those who are ineligible to vote (namely, convicted felons and those under age eighteen), while it helps to provide a "random selection of a fair cross section of persons residing in the community." 18 U.S.C. 1863(b)(3); *see United States v. Garcia*, 991 F.2d 489, 491 (8th Cir.1993). If an additional source such as driver's licenses were used to supplement voter registration lists, the cost of administering the system would increase substantially because the need to screen these supplemental lists would produce significant administrative burdens.[2] (*See* Testimony of Gary McFarland, Transcript of the Sanchez/Alvarez hearing in Omaha and Ex. 1.)[3]

The present system has been implemented as follows: The court's docket is informally divided into three "subdistricts" centered around the communities of Omaha, Lincoln, and North Platte. For each of the three subdistricts a master jury wheel is compiled using voter registration within each individual subdistrict. Thus, voters who reside within the North Platte subdistrict may be drawn as prospective jurors for cases tried in North Platte; voters who reside in the Omaha subdistrict may be drawn as prospective jurors for cases tried in Omaha; and voters who reside in the Lincoln subdistrict may be drawn as prospective jurors for cases tried in Lincoln. (See McFarland testimony at the Sanchez/Alvarez hearing.) During each presidential election lists of prospective jurors are formed for each of the subdistricts, by calculating the number of jurors likely to be needed and mailing out the appropriate number of juror questionnaires.[4] Thereafter, each month court officials estimate the number of petit jurors likely to be needed, and the names of prospective jurors are selected from the list at random and placed into the jury wheel. Unlike petit jurors, grand jurors are called from the entire state on a pro rata basis. Normally, at least one hundred names of prospective grand jurors

---

1. The current plan was adopted by the district on February 18, 1989 and subsequently approved by the Judicial Council of the Eighth Circuit Court of Appeals on March 10, 1989. Under some circumstances 28 U.S.C. § 1863 authorizes the use of other lists to augment voter registration lists.

2. Moreover, supplemental lists have often proven ineffective in increasing minority representation in jury pools. John P. Bueker, Note, *Jury Source Lists: Does Supplementation Really Work?*, 82 Cornell L.Rev. 390 (1997) (examining data from the sixteen federal districts which have enacted supplementation programs and concluding that supplementation is not only ineffective but also quite costly).

3. The transcript and exhibits of another hearing challenging the system were entered into evidence upon stipulation of the parties in this case. (*United States v. Gilberto Sanchez*, 8:CR96:013, and *United States v. Flores Alvarez*, 8:CR96–001.)

4. The wheels are refilled at this time because voter registration typically increases during presidential elections.

are drawn, and from that number, twenty-three are selected for service. (*Id.*)

Among the information requested in the jury questionnaires is the race of the voter.[5] (Sanchez/Alvarez Ex. 2.) Five racial categories are listed on the questionnaires: "Black," "White," "American Indian," "Asian," and "Other (specify)." The words "Other (specify)" are followed by a blank in which a description can be written. The questionnaire also asks, "Are you Hispanic? Yes/No." Persons who fail to answer the question are counted as nonhispanic.

Although the parties disagree as to the degree of underrepresentation of African-Americans in the jury pool, the differences between their calculations are relatively minor. According to defendant's calculations, the jury pool for the entire district consists of the following:

### Census Population [6] Compared with Representation of Jury Wheels (State of Nebraska by Race)

| Race | % of Jury Wheels | % of Population |
| --- | --- | --- |
| White | 95.90% | 94.28% |
| Black | 2.06% | 3.11% |
| Am. Indian | 0.37% | 0.63% |
| Asian | 0.28% | 0.39% |
| Hispanic | 0.86% | 1.56% |
| Other | 0.48% | 0.03% |

(Ex. 101.) [7] According to defendant, the following proportions exist in the Lincoln subdistrict:

### Census Population Compared with Representation of Jury Wheels (Lincoln subdistrict by Race)

| Race | % of Jury Wheels | % of Population |
| --- | --- | --- |
| White | 97.92% | 97.53% |
| Black | 0.52% | 0.86% |
| Am. Indian | 0.21% | 0.36% |
| Asian | 0.24% | 0.28% |
| Hispanic | 0.62% | 0.96% |
| Other | 0.49% | 0.02% |

5. This information is collected for statistical purposes and is not considered in forming the wheels.

6. It is important to note that the U.S. Census data does not reflect those persons in each racial category who are ineligible to serve on a jury because they cannot speak or read English or have been convicted of a felony. See 28 U.S.C. § 1865(b)(5). For this reason the absolute and comparative disparities of both parties are likely skewed in an unknown direction. Further, comparative disparity only measures the probability of being selected for a venire panel; in the context of petit juries, it does not account for such factors as attorney questioning during voir dire. Thus, it does not accurately depict the actual reduction of the chance that a specific African-American will actually sit on any particular jury, as compared to the number of African-Americans who reside in the community.

7. Only the numbers that have been adjusted for age are relevant because citizens must be at least eighteen years of age to serve on a jury. See 18 U.S.C. § 1865(b)(1); *United States v. Brummitt*, 665 F.2d 521, 529 (5th Cir.1981). In two similar cases, *United States v. Coronell–Perez*, 4:96CR–3053, and *United States v. Perez–Coronel*, 4:96CR–3038, the relevant statistics of both the government and the defense were slightly different because Furnas County, Nebraska was mistakenly omitted from that data.

(Ex. 102.) The figures for the entire state are relevant for the considering fair representation on grand juries, while the figures for the Lincoln subdistrict are relevant for considering fair representation on petit juries.[8]

Absolute disparity measures the difference between the percent of African–Americans in the population as opposed to the percent of African–Americans in the jury wheel. Absolute disparity is calculated by subtracting the smaller percentage from the large percentage. Comparative disparity purports to measure the degree to which the probability of serving as a juror is reduced for people in a cognizable class. Comparative disparity is calculated by dividing the absolute disparity by the percentage population of the group. By defendants' calculation, when corrected for age, the absolute disparity between the number of African–Americans that reside in the state and the number of African–Americans included in the jury wheel is 1.05%. When corrected for age, the comparative disparity between the number of African–Americans that reside in the state and the number of African–Americans included in the jury wheel is 33.8%. (Ex. 101.) For the Lincoln subdistrict the absolute disparity is 0.34%, and the comparative disparity is 39.5%. (Ex. 102.)

According to the government's calculations, the relevant proportions for the entire state are as follows:

*Census Population Compared with Representation of Jury Wheels (State of Nebraska by Race)*

| Race | % of Jury Wheels | % of Population |
|------|------------------|-----------------|
| White | 95.97% | 94.28% |
| Black | 2.06% | 3.11% |
| Hispanic | 0.90% | 1.56% |
| Others | 1.07% | 1.05% |

(Ex. 200).[9] According to the government, the following proportions exist in the Lincoln subdistrict:

*Census Population Compared with Representation of Jury Wheels (Lincoln subdistrict by Race)*

| Race | % of Jury Wheels | % of Population |
|------|------------------|-----------------|
| White | 97.91% | 97.53% |
| Black | 0.55% | 0.86% |
| Hispanic | 0.75% | 0.96% |
| Others | 0.80% | 0.66% |

(Ex. 200.[10] Lincoln has a lower minority population than Omaha and thus a lower proportion than the overall district. (*See* Sanchez/Alvarez exs.))

By the government's calculation, when corrected for age, the absolute disparity between the number of African–Americans who reside in the Lincoln subdistrict and the number of African–Americans included in the jury wheel is 0.31%. The government's absolute disparity calculation for the entire district was 1.05%. When corrected for age, the comparative disparity between the number of African–Americans that reside in the Lincoln subdistrict and the number of African–Americans included in the jury wheel is 36.31%. The government's comparative disparity calculation for the entire district was 33.74%.

---

8. Defendant challenges the constitution of both petit and grand juries.

9. For the sake of simplicity I have rounded these numbers to the nearest hundredth of a percent.

10. These numbers have also been rounded to the nearest hundredth.

(Ex. 200.) Thus, the government's figures reflect slightly smaller degrees of disparity than the defense.

In addition to the disparity calculations, the government's expert, University of Nebraska Statistics Professor Dan Nettleson, also calculated the "substantial impact" of using voter registration lists. According to his calculations, in a randomly selected group of 200 prospective jurors from the entire district, 2.1 less African–Americans would appear in the group than if a random group of 200 persons were drawn from the adjusted Census data. Moreover, in a randomly selected group of 200 persons from the Lincoln subdistrict, there would be 0.6 less African–Americans appear in the group than if a random group of 200 persons were drawn from the adjusted Census data. Therefore, the government argues that in real terms the actual impact of selecting jurors from voter registration lists is slight.

## DISCUSSION

■ Defendant Jimmie C. Johnson seeks to dismiss the grand jury indictment, claiming that forming the petit and grand jury wheels from voter registration lists violates the Sixth Amendment right to a fair jury and the Jury Selection and Service Act, 28 U.S.C. § 1861 *et seq.* The elements of a Sixth Amendment challenge and a challenge brought under the federal statute are the same. *United States v. Miller,* 771 F.2d 1219, 1227 (9th Cir.1985); *United States v. Clifford,* 640 F.2d 150, 155 (8th Cir.1981). In order to demonstrate a prima facie violation of the Sixth Amendment and of the Jury Selection Act, defendant must demonstrate that (1) the group alleged to be excluded is a "distinctive group" in the community, (2) the representation of this group in venires from which juries are selected is not "fair and reasonable" in relation to the number of persons in the community, and (3) the underrep-

resentation is due to "systematic exclusion of the group in the jury-selection process." *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). African–Americans are a clearly a distinctive group. *See Rose v. Mitchell,* 443 U.S. 545, 551, 99 S.Ct. 2993, 2997–98, 61 L.Ed.2d 739 (1979). Thus, the first element of the Duren test has been met; however, for the reasons stated below, I conclude that defendant has failed to demonstrate the second and third elements of his challenge.

### Fair Representation

To prevail defendant must demonstrate that the representation of African–Americans in the jury pool is not "fair and reasonable" in relation to the number of African–Americans in the community. 439 U.S. at 364, 99 S.Ct. at 668–69. The relevant community consists of those African–Americans presumptively eligible to vote who reside in the District of Nebraska. *See Taylor v. Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692, 701–02, 42 L.Ed.2d 690 (1975) (comparing the population "eligible for jury service"); *United States ex rel. Barksdale v. Blackburn,* 639 F.2d 1115, 1124 (5th Cir.), *cert. denied,* 454 U.S. 1056, 102 S.Ct. 603, 70 L.Ed.2d 593 (1981) (the relevant comparison is to the number of citizens of the community that are eligible to serve); *United States v. Haley,* 521 F.Supp. 290, 292 (D.Ga.1981) ("eligible population is preferable and provides a more accurate picture of representation"). *Cf. African American Voting Rights Legal Defense Fund, Inc. v. Villa,* 54 F.3d 1345, 1352–53 (8th Cir.1995) (relevant population for Voting Rights Act was "voting age population," not total population).

■ Mere numeric disparity is insufficient to sustain a Sixth Amendment claim. *Garcia,* 991 F.2d at 492.[11] In order for a consti-

**11.** In *United States v. Rogers,* 73 F.3d 774, 777 (8th Cir.), *reh'g denied,* (Feb. 16, 1996), *cert. denied,* —— U.S. ——, 116 S.Ct. 1889, 135 L.Ed.2d 183, (1996), an Eighth Circuit panel affirmed based on *Garcia* the defendant's failure to prove a *Duren* claim, but in so doing Judges Heaney and McMillian commented that they believed *Garcia* should be overruled and that a small absolute disparity can justify a *Duren* claim. Although those judges suggested rehearing by the full circuit *en banc,* Roger's subsequent request for an *en banc* rehearing was denied. Further, Judge Beam argued that *Garcia*

had been correctly decided and that the requirement of showing a systematic exclusion beyond a small numeric underrepresentation is appropriate. 73 F.3d at 778–779 (Beam, J., concurring). Subsequently, another panel has applied *Garcia* and rejected the approach suggested in *Rogers. See Smith v. Copeland,* 87 F.3d 265, 269 (8th Cir.1996). As such, until the full court considers the issue, the comments of Judges Heaney and McMillian in *Rogers,* regardless of their merit, are not law and cannot guide this decision. *See Campbell v. Purkett,* 957 F.2d 535, 536 (8th Cir. 1992) (one appellate panel cannot overrule another appellate panel).

tutional claim to lie, the underrepresentation of the group must be both "continual" and "substantial." *Id.* "Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group." *Swain v. Alabama,* 380 U.S. 202, 208, 85 S.Ct. 824, 829, 13 L.Ed.2d 759 (1965). In *Swain,* the Court held that an absolute disparity of ten percent between African–Americans in the jury pool and those in the community did not constitute an unfair cross-section of the community. *Id.* at 208, 85 S.Ct. at 829–30. Furthermore, in *Garcia,* the Eighth Circuit ruled that an absolute disparity of approximately one percent was insufficient to support a constitutional violation. 991 F.2d at 492. *See also United States v. Clifford,* 640 F.2d 150 (8th Cir.1981) (absolute disparity of Native Americans of 7.2% did not violate the constitution).[12]

▮ In this case, the absolute disparity for the entire district, where the grand jury that indicted defendant was drawn, is 1.05%.[13] The disparity in the Lincoln community, where defendant's petit jury will be drawn, is even less, 0.31% or 0.34% depending on whose numbers are used. Quite obviously, these levels of disparity are well below those upheld in both *Swain* and *Garcia.* To escape this difficulty defendant focuses on the comparative disparity figures (36.31 to 39.5% for Lincoln; 33.11% to 33.8% for the district as a whole). Comparative disparity measures the reduced likelihood of a juror of a specific race appearing in the pool. I note, however, that it is clear from *Swain* and *Garcia* that absolute disparity rather than comparative disparity is the decisive measure for constitutional purposes.[14] In addition, comparative disparity has been criticized because by its nature it shows "a greater degree of underrepresentation in situations in which the defendant's chances [of receiving an underrepresenative jury] have been affected to a lesser degree ..." Petre A. Detre, Note, *A Proposal for Measuring Underrepresentation in the Jury Wheel,* 103 Yale

L.J.1913, 1914 (1994). *See, e.g., United States v. Hafen,* 726 F.2d 21, 24 (1st Cir. 1984) (use of comparative disparity is inappropriate because it distorts the degree of underrepresentation of small groups).

When the percentages in this case are viewed in context, it becomes apparent that the actual significance of underrepresentation on jury panels is low. The district typically calls two hundred persons for jury service every month. According to Census data, in this number approximately six African–Americans should typically appear in a grand jury pool from the entire state; by using voter registration four will typically appear. In a pool of two hundred persons drawn from the Lincoln subdistrict, according to Census data 1.7 African–Americans should appear; by using voter registration, 1.1 person will typically appear. Under present law, the difference between, at most, two persons in a venire of two hundred is statistically too insignificant to result in a constitutional violation. *United States v. Sanchez,* 8:CR96–083, slip. op. at 26, (D.Neb. April 4, 1997). *See also Garcia, supra; United States v. Jenkins,* 496 F.2d 57 (2d Cir.1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975).

In his brief defendant tries to avoid the de minimis effect of using voter registration lists by lumping Blacks, Hispanics, and Native Americans together for purposes of statistical analysis. Even assuming that in this context defendant can invoke the third-party rights of jurors of races other than his own, *see Powers v. Ohio,* 499 U.S. 400, 416, 111 S.Ct. 1364, 1373–74, 113 L.Ed.2d 411 (1991) (allowing criminal defendants to do so with regard to *Batson* claims, where the prosecutor *purposefully* excludes jurors because of race), lumping all minorities into one "group" does not avail him here. Whites are overrepresented by only 1.69% in the statewide jury pool and by only 0.39% in the jury pool for the Lincoln subdistrict. (Ex. 200.) In a randomly selected district-wide group of 200

---

12. In contrast, *Duren* which did find a constitutional violation involved an absolute disparity of 40%. 439 U.S. at 365, 99 S.Ct. at 669.

13. Further, for the reasons noted above, these figures likely overestimate the disparity.

14. In *Rogers,* Judge Heaney argued that comparative disparity is the better measure. 73 F.3d at 776–77. While this argument may have some merit, I am bound to follow precedent.

persons, this amounts to three more whites than would otherwise appear. In a randomly selected group of 200 persons from the Lincoln subdistrict, less than one more white will appear than would otherwise be the case. (*Id.*) As noted above, under the current state of the law, this degree of underrepresentation is simply too small to raise constitutional difficulties. *See Swain, supra; Garcia, supra; Clifford, supra.*

For these reasons, defendant's motion for dismissal fails on the second prong of the *Duren* test.

### Systematic Exclusion

Although defendant has failed to establish that the degree of representation of African–Americans in the jury pool is constitutionally significant, I shall briefly discuss his argument that jurors are systematically excluded. First, it is important to point out that in this case there is absolutely no evidence of purposeful discrimination in forming the master jury wheels. Second, the degree of absolute disparity is so small that no inference of systematic exclusion can arise. *Garcia,* 991 F.2d at 492 (no inference of systematic exclusion where absolute disparity was approximately one percent). Third, as stated by Judge Jaudezmis, "the decision of eligible persons not to register to vote, whatever their race or ethnicity, is not evidence of this district's systematic exclusion of those persons from its juries." *United States v. Sanchez,* 8:CR96–083, slip. op. at 29 (D.Neb. April 4, 1997). *See United States v. Test,* 550 F.2d 577, 587 n. 10 (10th Cir.1976) (all eligible citizens have equal access to vote and to sit on federal juries); *United States v. Freeman,* 514 F.2d 171, 173 (8th Cir.1975) (by using voter registration lists Congress intended to provide a "relatively large and easily accessible source of names" of prospective jurors).

### CONCLUSION

In summary, even if every reasonable factual dispute is resolved in favor of defendant, any underrepresentation in the jury system is simply too slight to have constitutional significance, and there is no evidence of systematic exclusion of African–American jurors.

**IT THEREFORE HEREBY IS RECOMMENDED** to the Honorable Richard G. Kopf, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), that defendant's motion to dismiss, (filing 34), be denied.

The parties are notified that unless objection is made within ten days after being served with a copy of this recommendation, they may be held to have waived any right they may have to appeal the court's order adopting this recommendation.

June 19, 1997